ARKANSAS DEPARTMENT of HUMAN SERVICES *v.*
Ben BIXLER and Sharon Bixler

CA 04-1043                                           210 S.W.3d 135

Court of Appeals of Arkansas
Opinion delivered June 15, 2005

[Rehearing denied August 24, 2005.*]

---

* GRIFFEN, J., would grant rehearing.

*Gray Allen Turner*, for appellant.

*Morgan & Tester, P.A.*, by: *Kent Tester*, for appellee.

J OHN B. ROBBINS, Judge. This appeal concerns whether appellees Ben and Sharon Bixler neglected their children as defined in Ark. Code Ann. § 12-12-503(12)(G) (Supp. 2001), and whether their names should be placed upon the child-abuse registry as a consequence. Appellant Department of Human Services ("DHS") appeals the reversal of a finding of child neglect by the Van Buren County Circuit Court following an appeal from an administrative decision. DHS argues that the administrative decision is supported by substantial evidence and should be reinstated. The administrative law judge ("ALJ") found that a preponderance of the evidence supported the finding that the Bixlers violated Ark. Code Ann. § 12-12-503(12)(G) by failing to protect their children. We disagree with DHS's argument, and we will not reinstate the administrative decision because it is not supported by substantial evidence.

The facts are essentially undisputed. DHS investigated a hotline phone call made on October 16, 2002, stating that the Bixlers allowed their children to have unsupervised overnight visits with their step-grandfather, Roger Bonds, a convicted sex offender. At that time, the Bixler children were ages ten (Rebecca), eleven (Rachel), twelve (Sarah), and fourteen (Dustin). Roger Bonds was married to Ben Bixler's mother, Juanita, and had lived with her since 1995. The Bixler family lived a few hundred feet from the home of Juanita and Roger. They had been in close contact on a nearly daily basis since 1995, and the children often went to Juanita and Roger's house to visit. Juanita died suddenly in her home on April 29, 2002. Though the children did not visit the house for a couple of months, they resumed visiting Roger, sometimes overnight, that summer.

In response to the October 2002 phone call, a DHS investigator went to the Bixler home and interviewed the parents. The Bixlers did not dispute that they were aware that Roger had a criminal conviction, which they had heard was for sexual abuse, but the Bixlers denied any specific knowledge of the details surrounding his conviction, except that Sharon had claimed to have seen "court papers."

The Bixlers agreed that their children visited Juanita and Roger by walking across the field to their home, often spending the night. The Bixlers explained that the houses were within "hearing" distance of one another. They agreed that after Juanita died in her home, the children had been grieving her loss and did not want to go back for a while. They said that Rebecca, Rachel, and Dustin resumed visiting their step-grandfather overnight in July 2002, usually on a couple of Fridays per month, and in pairs. They also visited occasionally in the daytime for a few hours, also in pairs. The Bixlers said that they had known Roger and had observed him with their children for seven years, and they had no reason to fear him. In the reports of the parental interview, Ben and Sharon Bixler stated their belief that Sharon's mother and sister had made this call in revenge for leaving the Pentecostal church and allowing the girls to wear pants.

DHS's position was that the parents were neglecting their children by allowing them to stay overnight with Roger without supervision. With that, Ben assured DHS that from that point forward, the children would not be allowed to spend time alone with Roger without parental supervision. Ben wrote a letter to DHS for their files commemorating that assurance.

The DHS investigator interviewed Roger. The investigative notes revealed that Roger stated that he did not have any restriction from being around minors and was not mandated to register, as he had been released from prison before that law existed. These notes reveal no further information about Roger's conviction.

The DHS interview with Rachel revealed that she and Rebecca liked to spend the night, sometimes accompanied by Dustin. She said Sarah did not like to go since their grandmother died. They ate ice cream and candy, listened to music, and went to bed. Rachel said Roger did not like for all four children to spend the night at once because the noise would get on his nerves. She said Roger was never inappropriate with any of them.

The interview with Sarah revealed that she did not like to spend the night anymore since her grandmother died, but that when she did spend time with Roger, he never did anything to make her uncomfortable. She said that all the children liked Roger because he is fun. Sarah was the most upset of the children about Juanita's death.

The interview with Rebecca revealed that she enjoyed spending the night with Roger, where they would play games, watch television, go to bed, get up and get dressed, and walk home. Rebecca agreed that Sarah did not like to go anymore because she missed their grandmother but that Sarah had not said anything bad about Roger.

The interview with Dustin showed that he was mentally retarded. Dustin said they spent the night with Roger, where Dustin helps with the chickens and with picking up wood. Dustin said they ate ice cream at night and ate breakfast with Roger on Saturday morning. He said he and his sisters were not uncomfortable with Roger, and he also described Roger as fun.

In testifying at the hearing, the investigator related that the parents thought that it was alright to allow the children to go over to Roger's house as part of the grieving process, despite what they knew about Roger's past. The DHS investigator stated that her files showed two sexual-abuse investigations involving Roger, and she believed the latter one regarding a niece led to his conviction for sexual abuse. DHS had no evidence, nor did it allege, that the Bixler children were ever harmed or abused by Roger at any time, and the investigator believed that the children were truthful in their interviews.

The Bixlers testified that they had taught their children that if any person ever touched them inappropriately, the children should inform them. They also stated that given their long-

standing relationship with Roger and their close proximity to Roger's house, they did not feel that they had been neglectful of their children.

On this evidence, the ALJ noted the burden of proof on DHS to show by a preponderance of the evidence that the allegation of neglect was true. Ark. Code Ann. § 12-12-512(a). The ALJ found that DHS had proved violation of section 12-12-503(12)(G), defining neglect as failing to appropriately supervise that results in a child being left alone at an inappropriate age or in an inappropriate circumstance that puts the child in danger. The ALJ noted the internal DHS protocol defining "failure to protect" as failing to take reasonable action to protect a child from mal-treatment when the person has reasonable cause to believe that the child is "in significant danger of being maltreated."

The ALJ's factual findings explained that after Juanita died, the Bixlers had a duty to inquire more about Roger's conviction and a duty to ensure that the children were not left alone with Roger, especially overnight, even though they had known and observed him for seven years. The ALJ's decision read:

> I find that the agency met its burden of proof against the Petitioners; and I find that the Petitioners' actions in this matter constitute a violation of Ark. Code Ann. § 12-12-503(G) because the Petition-ers allowed their children to be left alone overnight in inappropriate circumstances; i.e. in the home of a convicted sexual offender. The Petitioners' names shall remain on the Arkansas Child Mal-treatment Central Registry based on the October 16, 2002 report.

The Bixlers appealed this decision to the circuit court, which reversed the ALJ's decision that found the Bixlers to have violated section 12-12-503(12)(G). After the circuit court reversed the finding of neglect, DHS appealed the circuit court decision to our court.

On appeal from the circuit court, our review of administrative decisions is directed to the decision of the admin-istrative agency, rather than the decision of the circuit court. *Vallaroutto v. Alcoholic Bev. Control Bd.*, 81 Ark. App. 318, 101 S.W.3d 836 (2003). We review the case only to ascertain whether there is substantial evidence to support the agency's decision or whether the decision runs afoul of one of the other criteria set out in Ark. Code Ann. § 25-15-212(h) (2002). Judicial review is limited in scope; the administrative agency decision will be upheld

if supported by substantial evidence and if it is not arbitrary, capricious, or an abuse of discretion, reviewing the entire record to make that determination. *DHS v. Burgess*, 86 Ark. App. 96, 161 S.W.3d 319 (2004). Substantial evidence has been defined as valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support a conclusion, and force the mind to pass beyond conjecture. *Bohannon v. Ark. Bd. of Nursing*, 320 Ark. 169, 895 S.W.2d 923 (1995); *see also Ark. State Highway & Transp. Dep't v. Kidder*, 326 Ark. 595, 933 S.W.2d 794 (1996). We defer to the credibility determinations made at the administrative level, if there are any to be made. *Ark. State Racing Comm'n v. Wayne Ward, Inc.*, 346 Ark. 371, 57 S.W.3d 198 (2001).

DHS acknowledges in its brief that "there are no bright lines to determine what are inappropriate circumstances, or what constitutes an unreasonable danger." This query is necessarily fact-driven. DHS urges affirming the ALJ because there is a duty to protect, the harm was foreseeable, and the gravity of danger was unreasonable; therefore, the children "had been subjected to potential danger when they spent the night." While it is clear that parents have a duty to protect their children, we hold that there is no substantial evidence to support a finding that the Bixler children were placed in danger on these facts. Indeed, the ALJ did not make any specific finding that the children were put in danger, but only found that the circumstances were inappropriate.

▮ Arkansas Code Annotated section 12-12-503(12) (Repl. 2003) defines "neglect" as follows:

> (A) Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;

> (B) Failure or refusal to provide necessary food, clothing, shelter, and education required by law, excluding the failure to follow an individualized educational program, or medical treatment necessary for the juvenile's well-being, except when the failure or refusal is caused primarily by the financial inability of the person legally responsible and no services for relief have been offered or rejected;

> (C) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of the condition was known or should have been known;

(D) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile;

(E) Failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care;

(F) Failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume such responsibility; or

(G) Failure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances that put the juvenile in danger[.]

To consider the application of subsection (G), we consider relevant the following. The DHS investigator's recollection of the children's interviews was accepted as true, and there was never any allegation that Roger abused the children, before or after Juanita's death. DHS had no concerns with the children visiting overnight while Juanita was alive.[1] Once the Bixlers were informed that DHS had concerns, they immediately ceased allowing any overnight visitation without adult supervision. DHS's allegation of neglect is narrowed to this: the Bixlers allowed the children to visit overnight in pairs on approximately six occasions[2] during which no abuse was ever alleged to have occurred. There is no substantial evidence that the three Bixler children that visited Roger overnight were in danger.

■ DHS's appellate counsel also argues that the law since 1997 has required sex offenders to register in order to protect the public due to the risk of re-offending, which supports the agency decision. We recognize that the sex-offender registry has as its purpose the goal of offering information so that the citizenry can better protect themselves and those who cannot protect them-

---

[1] The dissent argues that it does not make any difference whether the children only visited in pairs because "sexual abuse often happens when others are present in the same house." Under that rationale, the children were subjected to neglect regardless of parental (or grandparental) presence in the same house, in direct conflict with DHS's position. We focus our review upon the evidence before the ALJ and DHS's arguments to support the administrative decision.

[2] DHS did not allege a specific number of overnight visits, but the parents said the children visited overnight in pairs and usually on one or two Friday nights per month.

selves. Nevertheless, what is properly before us today is whether the Bixlers in this particular situation neglected their children. "Courts may not accept the appellate counsel's post hoc rationalizations for an agency action; an agency's action must be upheld on a basis articulated by the agency itself." *DHS v. Haen*, 81 Ark. App. 171, 177, 100 S.W.3d 740, 744 (2003) (citing *Motor Vehicle Mfr. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) and *AT & T Communications of Southwest, Inc. v. Ark. Pub. Serv. Comm'n*, 40 Ark. App. 126, 843 S.W.2d 855 (1992)).

■ The purposes of the Child Maltreatment Act are to protect the best interest of the child, to prevent further harm to the child, to stabilize the home environment, and to preserve family life. Ark. Code Ann. § 12-12-501 (Repl. 2001).[3] We hold that reasonable minds could not conclude on these undisputed facts that the Bixlers neglected their children by allowing three of them to spend the night on a few occasions with Roger following Juanita's death, especially where those visits went without any suggestion of abuse. To hold otherwise would not comport with the purposes of the Child Maltreatment Act.

The administrative decision is reversed, and the circuit court decision is affirmed.

HART, NEAL, CRABTREE, and ROAF, JJ., agree.

GRIFFEN, J., dissents.

WENDELL GRIFFEN, Judge, dissenting. The issue in this case is whether the parents placed their children in danger by allowing them to have unsupervised, overnight visitation with a person who they knew, or had reason to suspect, was a convicted child sex offender. The majority would reverse on the ground that the children were not placed in danger because there was no "suggestion of abuse." I dissent because the Child Maltreatment Act does not require proof of actual harm in order to have an offender's name placed on the Child Maltreatment Central Registry. Accordingly, reasonable minds could have concluded, as the ALJ did, that because the Bixlers either knew or should have known of Bonds's history of committing a sexual offense with a child, they endangered their children by leaving them in his exclusive care.

---

[3] The "purpose" section was rewritten in 2003, generally providing the same goals, but the law in effect at the time of these accusations in 2002 is applicable.

The majority fails to cite to all of the relevant portions of the ALJ's order. In determining that the Bixler children had been neglected the ALJ reasoned, in relevant part, as follows:

> In this case, sufficient evidence indicates that the Petitioners *knew* or *should have known* that their children's step-grandfather, Roger Bonds, was a convicted sexual offender. This ALJ agrees that *after* the death of the children's grandmother, the Petitioners had a duty to inquire about the "rumors" they had heard concerning Mr. Bonds' conviction. This ALJ recognizes that the Petitioners believed that they had sufficiently "watched" Mr. Bonds over a seven (7)-year period. However, after the death of the children's grandmother, circumstances in the Bonds' home changed and there was only one adult in the home: *"a convicted sexual offender."* At the very least, the Petitioners should have asked about the circumstances surrounding Mr. Bonds' conviction; and, they should have assured that their children were *not* left alone in Mr. Bonds' presence, *especially overnight*. Despite the ages of the Petitioners' children, this ALJ finds that reasonable minds would find that it was *not* in the children's best interests to remain overnight, without other adult supervision, in the home of a convicted sexual offender.

> The Petitioners did *not* present any evidence that would lead this ALJ to find that the agency failed to meet its burden of proof in this matter. Therefore, I find that the agency met its burden of proof against the Petitioners; and I find that the Petitioners' actions in this matter constitute a violation of Ark. Code Ann. § 12-12-503(12)(G) because the Petitioners allowed their children to be left alone overnight in inappropriate circumstances; i.e., the home of a convicted sexual offender. The Petitioners' names shall remain on the Arkansas Child Maltreatment Central Registry based on the October 16, 2002 report. (Emphasis in original.)

A person who has been found to be an offender pursuant to the Child Maltreatment Act ("Act"), Ark. Code Ann. § 12-12-501 (Supp. 2003) *et seq.*, is subject to having his name placed on the Child Maltreatment Central Registry ("Registry"). As correctly cited by the ALJ, the definition of "child maltreatment" under this Act includes "neglect" which, in turn, is defined as an act or omission of a parent that constitutes the "[f]ailure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances that put the juvenile in danger." Ark. Code Ann. §§ 12-12-503(6) & (12)(G). Given these authorities and the ALJ's order, it is implicit

that the ALJ found that the Bixlers placed their children in danger, in violation of § 12-12-503(12)(G), because they allowed the children to be left alone overnight in the home of a convicted sexual offender.

In essence, the majority holds that reasonable minds could not have concluded that the Bixler children were placed in danger, in violation of § 12-12-503(12)(G), because they were not sexually abused. The majority opinion cites to no authority requiring actual harm, nor explains why the Act would require actual harm in order to hold that the children were placed in danger, except to state that to hold otherwise would defeat the intent of the Act. However, the opposite is true: to hold as the majority does defeats the intent of the Act, which is consistent with the general intent of our criminal and civil laws to protect juveniles from the *risk* of harm.

For example, under our criminal code, a parent is criminally liable if he knows that his minor child is in illegal possession of a firearm upon the premises of a school, but fails to report the possession, even if the child does not use the weapon. Ark. Code Ann. § 5-26-206 (Supp. 2003). Further, any person may be criminally liable for second-degree endangerment of a minor where the person knowingly engages in conduct creating a substantial risk of serious harm to the physical or mental welfare of a minor. Ark. Code Ann. § 5-27-204 (Repl. 1997).

Moreover, pursuant to the civil statutes governing the termination of parental rights, which is a much harsher penalty than simply having one's name placed on the Child Maltreatment Central Registry, a child may be considered to be dependent-neglected where there is only a substantial risk of harm due to neglect. Ark. Code Ann. § 9-27-303 (17)(A)(v) (Supp. 2003); Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Supp. 2003). Notably, one definition of neglect, for termination purposes, is identical to the definition of neglect at issue in this case. Ark. Code Ann. § 9-27-303(35)(G).

Consistent with this general intent to protect juveniles *from the risk of harm*, and despite the majority's holding, § 12-12-503(12)(G) does not require that a child suffer actual harm in order to be considered neglected under the Act. That § 12-12-503(12)(G) applies in the absence of physical harm is supported by the fact that § 12-12-503 contains two separate sections that apply where actual harm has occurred. Section 12-12-503(12)(A) de-

fines neglect as the failure or refusal to prevent the abuse of the juvenile when the parent knows or has reasonable cause to know that the juvenile is or has been abused. Section 12-12-503(12)(C) defines neglect as the failure to take reasonable action to protect a juvenile from sexual abuse or neglect when the existence of the condition was known or should have been known. Thus, § 12-12-503 clearly provides grounds for placing a parent's name on the Registry in situations in which a child is placed at *risk* of harm, and where the harm has *actually* occurred. Accordingly, the majority's opinion reversing the ALJ's interpretation of § 12-12-503(12)(G) and requiring actual harm violates the clear intent to protect juveniles from the risk of harm.

Given these authorities, reasonable minds could have concluded, as the ALJ did, that the Bixlers neglected their children by either acting or failing to act in such a manner as to place their children in inappropriate circumstances that put the children in danger. The evidence regarding what the Bixlers knew about Bonds's prior conviction is conflicting, but the ALJ made a specific finding, by which this court is bound, that Ms. Hayes, the DHS worker, was credible. Hayes, who interviewed the Bixlers, testified that the Bixlers admitted that they knew Bonds had been imprisoned due to his conviction for a sexual offense. Mrs. Bixler told Hayes that they had seen copies of Bonds's court papers. Mr. Bixler told Hayes that Bonds informed them of his past at the time he married Mr. Bixler's mother and that he (Mr. Bixler) was aware of one allegation of sexual molestation.

In contrast to Hayes's testimony, the Bixlers testified that they had merely heard "rumors" about Bonds but did not know why he had been imprisoned; however, Mr. Bixler admitted that he heard rumors that Bonds's offense involved "child sex abuse." Yet, the Bixlers said that they were not concerned about leaving their children in Bonds's exclusive care because the children were so close to home; because they required the children to visit in pairs; and because the Bixlers never saw Bonds act inappropriately around the children.

The evidence that the Bixlers were aware of, but ignored, Bonds's criminal sexual history is disturbing, especially when one considers that the recidivism rate of sexual offenders is generally acknowledged to be high. Even before our General Assembly required sexual offenders to register for this very reason, the Arkansas Supreme Court recognized the inherent proclivity of persons who sexually abuse minors to repeat such acts with

multiple victims. *Simmons v. State,* 278 Ark. 305, 645 S.W.2d 680 (1983). Given the recognized risk that a sexual offender is likely to re-offend, it seems axiomatic that placing a child into a home, unsupervised, with a person who has previously been convicted of sexually abusing a minor, places that child in inappropriate circumstances that puts the child in danger.

As a practical matter, it makes no difference whether the Bixlers merely heard rumors or actually knew about Bonds's criminal history. If the Bixlers, in fact, knew about Bonds's history, then they should not have placed their children in his care. However, even if the Bixlers only heard rumors that Bonds had committed a sexual offense, they should have determined whether the rumors were true before allowing their children to stay, unsupervised, in his presence. The majority concludes that the Bixlers permitted their children to visit Mr. Bonds only "in pairs," even though the ALJ made no finding in this regard. Even if this conclusion is accurate, the majority's reliance on it is misplaced, because even if the children always visited Mr. Bonds in pairs, that did not lessen the danger to which they were exposed. Sexual abuse often happens when others are present in the same house; thus, the point is not whether the children stayed alone or in pairs. The point, as stated by the ALJ, is that "it was not in the children's best interests to remain overnight, without other *adult* supervision, in the home of a convicted sexual offender." (Emphasis added.)

The majority ignores that the very fact that the Bixlers were concerned enough to require the children to visit Bonds in pairs demonstrates their awareness that they were placing their children at risk by allowing the unsupervised visits. This is alarmingly demonstrated by Hayes's testimony that the Bixlers told the children that if Mr. Bonds touched them inappropriately, they needed to tell someone. Given these facts, the majority is hard-pressed to argue that the Bixlers did not place their children in inappropriate circumstances that put them in danger.

Finally, we have recognized that in order to defeat a petition to terminate parental rights it is not enough for a parent to refrain from personally harming the child; instead, it is the parent's duty to take *affirmative steps* to protect the child from harm. *Wright v. Arkansas Dept. of Human Servs.,* 83 Ark. App. 1, 115 S.W.3d 332 (2003)(emphasis added). By the same reasoning, in the face of actual knowledge or even mere rumors that the person to whom they had entrusted their children's welfare was a sexual offender, the parents here should have taken affirmative actions to protect

their children from harm. Accordingly, I would affirm the ALJ's decision because the Bixlers' neglect of their children justifiably resulted in their names being placed on the Registry.