ARKANSAS DEPARTMENT of HUMAN SERVICES *v.*
Ben and Sharon BIXLER

05-728                                                        219 S.W.3d 125

Supreme Court of Arkansas
Opinion delivered December 1, 2005

*Gray Allen Turner*, for appellant.

*Morgan & Tester, P.A.*, by: *Kent Tester*, for appellees.

JIM GUNTER, Justice. Appellant, Department of Human Services (DHS), appeals the order of the Van Buren County Circuit Court, reversing a finding of the agency's administrative law judge (ALJ), who ruled that appellees, Ben and Sharon Bixler, were neglectful by failing to protect their children. The circuit court's decision was affirmed by the Arkansas Court of Appeals in *Arkansas Dep't of Human Servs. v. Bixler*, 91 Ark. App. 277, 210 S.W.3d 135 (2005). This appeal is before us on petition for review pursuant to Ark. Sup. Ct. R. 2-4. We affirm the findings of the ALJ, and we reverse the circuit court.

On October 16, 2002, the Division of Children and Family Services at DHS received a phone call to the child-abuse hotline alleging suspected child maltreatment. The allegation was that Ben and Sharon Bixler allowed their children, a fourteen-year-old male, a twelve-year-old female, an eleven-year-old female, and a ten-year-old female, to stay overnight with their step-grandfather, Roger Bonds, a known sexual offender. Roger was married to Ben's mother, Juanita, who died on April 29, 2002, from a heart attack, but the children continued to visit Roger after Juanita's death.

DHS immediately began an investigation. On October 16, 2002, Carla Hayes, a DHS family-service worker, conducted an interview of the three female children at their school in the presence of Curtis Turner, the school superintendent. When Ms. Hayes introduced herself as a DHS worker, S.B., the twelve-year-old child, said, "Everything's okay at home, there's nothing wrong," before Ms. Hayes asked a question. S.B. stated that the children spent a lot of time with Roger. S.B. said that Roger paid her $3.00 to feed the chickens, and the children helped their grandfather gather wood. S.B. said that her grandfather never made her feel uncomfortable. She further stated that she had spent

the night at her grandfather's house once since her grandmother died. Throughout the interview, however, S.B. was "visibly shaking and upset" and would not make eye contact with Ms. Hayes.

R.B., the eleven-year-old child, stated that the children would spend the night with their grandfather on Friday or Saturday night and then would go to church with Roger on Sunday. According to Ms. Hayes's report, R.B. said that two children, usually R.B. and her younger sister, would spend the night with Roger because "it gets on his nerves with the noise from four children." She added that Roger never made them feel uncomfortable. According to R.B., they ate candy and ice cream and listened to music. R.B. said that her sister, S.B., did not like staying at Roger's house since her grandmother's death.

The ten-year-old child, R.B., told Ms. Hayes that Roger did not make the children feel uncomfortable. They played games and watched TV. R.B. said that her sister, S.B., does not like going to her grandfather's house because S.B. misses her grandmother. R.B. stated that her sister, S.B., has never "said anything bad" about Roger.

That evening, Ms. Hayes interviewed the Bixlers and their son, D.B., who has mental retardation. Ms. Hayes conducted a one-on-one interview with D.B., who said that, when he and his sisters spend the night with Roger, he picks up wood and helps with the chickens. D.B. said that he has fun at Roger's house, and they would eat ice cream together.

In Ms. Hayes's interview with Ben and Sharon Bixler, Ben stated that he and Sharon have emphasized to the girls that they should tell someone if anyone inappropriately touches them. According to Sharon, the children spent the night with Roger in pairs. The Bixlers knew about Roger's past when he married Ben's mother. Sharon said they knew of Roger's history, and they have seen his "court papers." Ben said that he was aware of one allegation of sexual molestation. When he spoke with Ms. Hayes, Ben agreed to prevent the children from spending the night with Roger. Ben said that his word was his bond, and he would mail the worker a notarized letter, stating the children would no longer be allowed to be alone with Roger. Sharon told Ms. Hayes that she believed her sister made the report because the Bixlers stopped attending church.

On November 15, 2002, Ms. Hayes interviewed Roger by telephone. Her report indicates that there are two true reports of

sexual abuse, and the victims' names are listed. In the interview, Roger stated that he was convicted of sexual abuse and was sentenced to four years in prison. He said there were no court orders forbidding him to be around children, and he conveyed that he was released from prison in 1994 before the law for the registration of sexual offenders went into effect in 1995. Roger said that he loved the children, but he "can't afford to take the chance." According to Ms. Hayes's testimony at the agency's hearing, Roger's prior conviction involved the sexual abuse of his niece.

Based upon Ms. Hayes's investigation, a finding of failure to protect was entered against the Bixlers. In a letter dated November 15, 2002, the Bixlers were notified that their names had been placed on the Child Maltreatment Central Registry operated by DHS. Ms. Hayes also made a report to the prosecuting attorney. On January 27, 2003, Ms. Hayes filed an administrative-hearing statement, concluding that the evidence supported the allegation of child maltreatment, and Sharon and Ben Bixler were named as the offenders for failure to protect their children. On June 20, 2003, the Bixlers filed a motion to remove their names from the Child Maltreatment Central Registry, challenging the laws and procedures by which DHS administers the Child Maltreatment Registry. On August 4, 2003, DHS responded to the Bixlers' motion.

An administrative hearing on the matter was held on September 18, 2003, with Toni White Bogan presiding as the ALJ. During the hearing, Ms. Hayes testified that the Bixlers stated that "[t]hey did not want to interfere with the grieving process [after Juanita's death], and they felt it was alright for the kids to continue seeing Mr. Bonds and spending the night." Ben Bixler testified that the Bixler residence is approximately five-hundred feet from Roger's house with a field between the two houses. He testified that the children were extremely close to their grandmother, and because of the close proximity of their houses, the children saw their grandmother and Roger on a daily basis before her death. Ben further stated that he never saw any behavior that indicated that Roger was a danger to the children, nor was Roger inappropriate toward the children. According to Ben, Roger was like a grandfather to them. Ben stated that he never had any reason to distrust Roger. Ben added that S.B., the oldest girl, took his mother's death the hardest. The other two girls, R.B. and R.B., went to Roger's house together.

Sharon Bixler testified that she saw Roger on a continuous basis during the seven years that he was married to Ben's mother. She had heard "rumors from people about his past . . . [as] a sexual offender." However, Sharon further testified that she was never alarmed, and that Roger always acted appropriately around the children. She said the children spent the night at his house two or three times per month since their grandmother passed away. Sharon said that she taught her children about what to do in the event that anyone should treat them inappropriately, and she never would have allowed them to go to Roger's house if she thought he was a danger to them.

On December 2, 2003, the ALJ entered an order, finding that DHS met its burden of proof against the Bixlers by a preponderance of the evidence. The ALJ ruled that there was sufficient evidence that the Bixlers knew or should have known that their children's step-grandfather was a convicted sexual offender, and that after the death of the children's grandmother, the Bixlers had a duty to inquire about the "rumors" of his prior offense. The ALJ further ruled that the Bixlers should have assured that their children were not left alone in Roger's presence, particularly overnight. The ALJ ruled that the Bixlers' actions constituted a violation of Ark. Code Ann. § 12-12-503(12)(G) because the Bixlers allowed their children to be left alone overnight in the home of a convicted sexual offender.

The Bixlers sought a judicial review of the administrative adjudication pursuant to Ark. Code Ann. § 25-15-212 (Repl. 2002). On June 2, 2004, the Van Buren Circuit Court entered a letter order, reversing the decision of the ALJ, and finding that the ALJ's ruling was not supported by substantial evidence. The circuit court further ruled that the Bixlers' names should be removed from the Child Maltreatment Central Registry. An order to that effect was entered on June 17, 2004. DHS timely filed its notice of appeal.

The court of appeals affirmed the circuit court's decision, holding that there was no substantial evidence to support the ALJ's finding that the Bixler children were placed in danger on these facts. *Bixler*, 91 Ark. App. 277, 210 S.W.3d 135 (2005). DHS filed a petition for review, which we granted on September 15, 2005. Upon a petition for review, we consider a case as though it had been originally filed in this court. *Rodriguez v. Arkansas Dep't of Human Servs.*, 360 Ark. 180, 200 S.W.3d 431 (2004).

██ Review of administrative agency decisions, by both the circuit court and appellate courts, is limited in scope. *Arkansas Dep't of Human Servs. v. Thompson,* 331 Ark. 181, 959 S.W.2d 46 (1998). The standard of review to be used by both the circuit court and the appellate court is whether there is substantial evidence to support the agency's findings. *Id.* Thus, the review by appellate courts is directed not to the decision of the circuit court, but rather to the decision of the administrative agency. *Id.* The circuit court or appellate court may reverse the agency decision if it concludes:

> (h) [T]he substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the agency's statutory authority;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error or law;
>
> (5) Not supported by substantial evidence of record; or
>
> (6) Arbitrary, capricious, or characterized by abuse of discretion.

Ark. Code Ann. § 25-15-212(h).

██ Substantial evidence is valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support the agency decision. *Arkansas Prof'l Bail Bondsman v. Oudin,* 348 Ark. 48, 69 S.W.3d 855 (2002). The challenging party has the burden of proving an absence of substantial evidence and must demonstrate that the proof before the administrative agency was so nearly undisputed that fair-minded persons could not reach its conclusion. *Id.* The question is not whether the evidence would have supported a contrary finding, but rather whether it supports the finding that was made. *Id.* Because administrative agencies are better equipped than courts, by specialization, experience, and more flexible procedures, to determine and analyze underlying legal issues affecting their agencies, the court may not substitute its

judgment and discretion for that of the administrative agency. *Thompson, supra.* It is also the prerogative of the agency to believe or disbelieve the testimony of any witness and to decide what weight to give the evidence. *Arkansas State Police Comm'n v. Smith,* 338 Ark. 354, 994 S.W.2d 456 (1999). With this standard of review in mind, we turn to the present case.

For its sole point on appeal, DHS argues that the ALJ's decision should be affirmed because there is substantial evidence to support the ALJ's finding. Specifically, DHS likens the situation to a tort action. DHS contends that the Bixlers breached their duty to protect their children from danger, and the potential for harm to the children was foreseeable.

In response, the Bixlers argue that the ALJ did not base her decision on Ark. Code Ann. § 12-12-503(12)(G). Specifically, they contend that the statute requires that they "put the child in danger," and they maintain that there was no evidence in the record that they put their children in danger. The Bixlers also assert that the record does not contain any evidence or information describing the nature and circumstances of Roger's conviction.

Arkansas Code Annotated § 12-12-503(6) defines child maltreatment as "abuse, sexual abuse, neglect, sexual exploitation, or abandonment." *Id.* Under Ark. Code Ann. § 12-12-512(a) (Supp. 2003), DHS shall determine whether allegations of child maltreatment are supported by a preponderance of the evidence. "Neglect" is defined in Ark. Code Ann. § 12-12-503(12)(G), which provides:

> (12) "Neglect" means those acts or omissions of a parent, guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent, custodian, guardian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, child care facility, public or private school, or any person legally responsible under state law for the juvenile's welfare, but excluding the spouse of a minor and the parents of the married minor, which constitute:
>
> * * *
>
> (G) Failure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances that put the juvenile in danger[.]

*Id.*

With these statutes in mind, we turn to the present case. Our review is limited to the ALJ's findings, which provide:

> In this case, sufficient evidence indicates that the Petitioners knew or should have known that their children's step-grandfather, Roger Bonds, was a convicted sexual offender. This ALJ agrees that after the death of the children's grandmother, the Petitioners had a duty to inquire about the "rumors" they had heard concerning Mr. Bonds' conviction. This ALJ recognizes that the Petitioners believed that they had sufficiently "watched" Mr. Bonds over a seven (7)-year period. However, after the death of the children's grandmother, the circumstances in the Bonds' home changed and there was only one adult in the home: "a convicted sexual offender." At the very least, the Petitioners should have asked about the circumstances surrounding Mr. Bonds' conviction; and, they should have assured that their children were not left alone in Mr. Bonds' presence, especially overnight. Despite the ages of the Petitioners' children, this ALJ finds that reasonable minds would find that it was not in the children's best interests to remain overnight, without other adult supervision, in the home of a convicted sexual offender.

> The Petitioners did not present any evidence that would lead this ALJ to find that the agency failed to meet its burden of proof in this matter. Therefore, I find that the agency met its burden of proof against the Petitioners; and, I find that the Petitioners' actions in this matter constitute a violation of Ark. Code Ann. § 12-12-503(12)(G) because the Petitioners allowed their children to be left alone overnight in inappropriate circumstances; i.e., the home of a convicted sexual offender. The Petitioners' names shall remain on the Arkansas Child Maltreatment Central Registry based on the October 16, 2002, report.

█ █ We agree with the ALJ's findings that, under Ark. Code Ann. § 12-12-503(12)(G), the Bixlers' failure to appropriately supervise their children resulted in the children being left alone in inappropriate circumstances that put them in danger. *See id.* "Danger" is defined as "[p]eril; exposure to harm, loss, pain, or other negative result." *Black's Law Dictionary* 421 (8th ed. 2004). We construe the word *danger* to include potential and actual danger, particularly in the context of child-maltreatment cases. Here, the Bixlers' allowing their children to stay overnight at the house of a known sex offender without another adult present constitutes a potential danger to their children. First, DHS produced reports of sexual abuse listing Roger as the offender.

Roger's first offense took place in 1987 in Pulaski County, while the other offense occurred in 1990 with his niece as the victim. Second, Roger admitted to Ms. Hayes that he served a sentence of four years for one criminal conviction. Third, both Ben and Sharon Bixler had knowledge of this prior conviction, admitting that they heard "rumors" of his history and prison sentence, but they never inquired about that conviction, despite seeing Roger's "court papers." Sharon admitted to Ms. Hayes that, if she had known that Roger's victims were eleven- and twelve-year-old girls, she would have taken additional precautions. Fourth, and most importantly, Ms. Hayes's report to the prosecuting attorney indicates that the anonymous caller said that S.B. "had a drastic change in her personality." Ms. Hayes further noted S.B.'s demeanor during the interview in which S.B. was visibly shaken, upset, and would not make eye contact. At the beginning of the interview, S.B. stated, "Everything's okay at home, there's nothing wrong," before Ms. Hayes asked a question. This evidence, which was presented by DHS, is substantial and supports the ALJ's findings.

■ We have said that the credibility and the weight of the evidence is within the administrative agency's discretion, and it is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord that evidence. *Teston v. Arkansas State Bd. of Chiropractic Examiners*, 361 Ark. 300, 206 S.W.3d 796 (2005). We adhere to this principle of law, refusing to substitute our judgment and discretion for that of the administrative agency. *Thompson, supra.*

■ Further, DHS raises the legislative intent behind the Sex Offender Registration Act of 1997, which is codified at Ark. Code Ann. §§ 12-12-901 through 12-12-920 (Supp. 2003), to support its contention that Roger poses a danger to the Bixler children. Arkansas Code Annotated § 12-12-902 provides that "sex offenders pose a high risk of re-offending after release from custody . . . [.]" Ark. Code Ann. § 12-12-902. The clear intent of the legislature is "the government's interest in public safety," *id.*, particularly the health and safety of the children of Arkansas.

■ For the foregoing reasons, as well as our standard of review, we hold that there was substantial evidence to support the ALJ's ruling that, under Ark. Code Ann. § 12-12-503(12)(G), the Bixlers placed their children in danger by allowing them to spend

overnight visits with their step-grandfather, Roger Bonds. Accordingly, we affirm the ALJ's decision, and we reverse the circuit court's order.

HANNAH, J., dissents.

JIM HANNAH, Chief Justice, dissenting. I respectfully dissent. I agree with the circuit court and the court of appeals that the ALJ's decision is not supported by substantial evidence. In this case, the majority agrees "with the ALJ's findings that, under Ark. Code Ann. § 12-12-503(12)(G), the Bixlers' failure to appropriately supervise their children resulted in the children being left alone in inappropriate circumstances that *put them in danger.*" (Emphasis added.) The majority goes on to construe the word *danger* to include potential and actual danger, particularly in the context of child-maltreatment cases. Then, the majority holds that "the Bixlers' allowing their children to stay overnight at the house of a known sex offender without another adult present constitutes a potential danger to their children." The problem with this holding is that the ALJ never made a finding that the Bixlers' actions put their children in danger. Rather, the ALJ concluded:

> . . . I find that the Petitioners' actions in this matter constitute a violation of Ark. Code Ann. § 12-12-503(12)(G) because the Petitioners allowed their children to be left alone overnight in inappropriate circumstances; i.e., the home of a convicted sexual offender.

It is not for this court to act as a fact finder and, certainly, this court cannot affirm a finding that was never made by the ALJ.

Even assuming that there is an implied finding that the Bixlers' actions put their children in danger, I still disagree with the majority's conclusion that there is substantial evidence of a violation of Ark. Code Ann. § 12-12-503(12)(G). DHS points out that "[t]here are no bright lines to determine what are inappropriate circumstances, or what constitutes an unreasonable danger." The crux of DHS's argument is that even though the Bixlers had no specific information about Roger's conviction, they should have at least inquired as to the nature of Roger's offense. This argument suggests that this proceeding would not have occurred had the Bixlers made the inquiry first and then made the decision to allow their children to spend the night with their step-grandfather. In addition, it appears that DHS is arguing that with the information

gained from an inquiry, i.e., the facts and circumstances surrounding the conviction, the Bixlers would have or should have known that it would be neglectful to leave the children alone with Roger. I might agree with DHS if I had before me the facts and circumstances surrounding the conviction; however, since DHS failed to present that evidence at the hearing, I cannot agree.

In support of its argument that the ALJ's decision was supported by substantial evidence, DHS claims that "because [Roger's] crime involved his eleven and twelve-year-old relatives, the ALJ correctly found that allowing the children to stay in [Roger's] home was unreasonably inappropriate and dangerous." During the telephone hearing, the following colloquy took place between DHS counsel and Sharon Bixler:

> Q: Were you aware that he'd gone to prison?
>
> A: I'd only heard rumors there.
>
> Q: Okay, did you ever ask Mr. Bonds . . . or Mrs. Bonds, the grandmother, for more information?
>
> A: No.
>
> Q: Okay. Um, why not?
>
> A: Because the way I see it, people wanted to tell me, they would tell me but if I had seen after rumors I had heard, if I'd seen or felt like Mr. Bonds was a threat to me or my children in any way there would be no way on earth I would have let them gone near him but I did not feel like there was a threat.
>
> . . . .
>
> Q: Okay, but my question to you is how could you make a decision that he was not a danger to your children if you didn't know the details of what he had done to other children? You didn't know the details, could you really say for sure whether or not he was a danger?
>
> A: It was just a feeling I had about him.
>
> Q: Oh. Um, as far as your opinion that he was not a danger, I want to test that opinion a little bit more. What if you

had asked him about the details or you had found out the details from someone and they, the details were his victims were eleven and twelve-year-old girls that he was somehow related to?

A: Yes.

Q: Would that have changed your opinion as to whether or not he was dangerous to your eleven and twelve-year-old girls?

A: It would have a strong effect on what I thought about him.

. . .

In their brief on appeal, the Bixlers take issue with DHS's assertion on appeal that Roger's conviction involved his eleven and twelve-year-old relatives. The Bixlers state that the record contains no such information, and that the question at the hearing regarding eleven and twelve-year-old girls was posed merely as a hypothetical question by the DHS attorney. DHS offers no response to this argument. Was the question a hypothetical, or was the question supported by the facts and circumstances surrounding Roger's conviction? We do not know because the record contains no evidence of the facts and circumstances surrounding the conviction.

The Bixlers contend that by finding them in violation of Ark. Code Ann. § 12-12-503(12)(G), the ALJ held them to a burden of discovering the nature and circumstances of Roger's conviction, but allowed DHS to present no evidence of it. I agree. Simply put, DHS failed to meet its burden of proof. Both the circuit court and the court of appeals recognized this, and I fail to understand why the majority of this court does not. Because I believe there is insufficient evidence to support the ALJ's decision that the Bixlers neglected their children as defined in § 12-12-503(12)(G) and that the Bixlers' names shall be permanently placed on the Arkansas Child Maltreatment Central Registry, I would reverse.